2013 CO 8

In re Emily LIEBNOW , a minor, BY AND THROUGH her next best friends and natural parents, Randy LIEBNOW and Suzanne Liebnow, Plaintiff,

v.

BOSTON ENTERPRISES INCORPORAT- ED , a Colorado Corporation, d/b/a Giacomo's; U.S. Foodservice, a Foreign Corporation; Tanimura & Antle Fresh Foods, Inc., a California Corporation; Tanimura & Antle Farming Company LLC, a Delaware Limited Liability Company; and Tanimura & Antle Land Company, a California Limited Liability Company, Defendants.

Supreme Court Case No. 12SA83

Supreme Court of Colorado.

February 4, 2013

Attorneys for Plaintiff: James E. Freemeyer P.C., Robert K. Reimann, Denver, Colorado.

Attorneys for Defendant Boston Enterprises, Incorporated, d/b/a Giacomo's: Hunter & Associates, Karen R. Wasson, Denver, Colorado.

Attorneys for Amicus Curiae Colorado Bar Association, Mark A. Fogg, President,

through Its Ethics Committee: Bennett S. Aisenberg, Denver, Colorado, Wheeler Trigg O'Donnell LLP, Nancy L. Cohen, Denver, Colorado, White & Steele, PC, John Lebsack, Denver, Colorado, Holland & Hart, LLP, Wiley E. Mayne, Denver, Colorado, TW Telecom, Peter R. Nadel, Littleton, Colorado, Pratt & Landry, LLP, Gerald D. Pratt, Lone Tree, Colorado, Fennemore Craig, P.C., Troy Rackham, Denver, Colorado.

Attorneys for Amicus Curiae Colorado Defense Lawyers Association: Ruebel & Quillen, LLC, Jeffrey Clay Ruebel, Westminster, Colorado.

No appearance by or on behalf of Defendants U.S. Foodservice, Inc.; Tanimura & Antle Fresh Foods, Inc; Tanimura & Antle Farming Company LLC; or Tanimura & Antle Land Company.

CHIEF JUSTICE BENDER delivered the Opinion of the Court.

¶ 1 We granted this petition for original jurisdiction under C.A.R. 21 to review the trial court's order denying a law firm's motion for pro hac vice admission to represent the plaintiff where an attorney at that same law firm had previously consulted with defense counsel about the case.

¶ 2 This is a personal injury case against a restaurant resulting from an alleged food-borne illness. The plaintiff sought to have a small out-of-state law firm that specializes in food-borne illness claims admitted pro hac vice to aid in the preparation and presentation of the case. The defendant objected on grounds that defense counsel had previously consulted with an attorney at the out-of-state firm about the case and her trial strategy.

¶ 3 The trial court denied the out-of-state law firm's motion for pro hac vice admission, thus disqualifying the firm from representing the plaintiff. In support of its ruling, the trial court found that the consultation between defense counsel and the out-of-state firm's attorney concerned confidential information that included defense counsel's theory of the case and her trial strategy, which created a conflict under Colo. RPC 1.7(a)(2). The conflict, the trial court concluded, was nonwaivable under Colo. RPC 1.7(b) because allowing the consulted attorney to represent the plaintiff would undermine the fairness of the proceedings. The trial court then imputed the conflict to the out-of-state firm under Colo. RPC 1.10 and denied the motion, thus disqualifying the firm from representing the plaintiff.

¶ 4 On appeal to us, the plaintiff argues that Colo. RPC 1.7 applies only to situations where an attorney-client relationship is established, and that the trial court's disqualification of the out-of-state law firm was an abuse of discretion. Our review of Colo. RPC 1.7(a)(2) reveals that the rule expressly applies not only to attorney-client relationships but also to attorneys' relationships with third persons. Accordingly, we hold that the trial court did not abuse its discretion in finding (1) that the consultation between defense counsel and the out-of-state firm's attorney concerned confidential information that included defense counsel's theory of the case and her trial strategy, which created a conflict under Colo. RPC 1.7(a)(2); and (2) that the conflict is nonwaivable under Colo. RPC 1.7(b) because allowing the consulted attorney to represent the plaintiff would undermine the fairness of the proceedings. We further hold that the trial court did not abuse its discretion by imputing the consulted attorney's conflict to the rest of his law firm under Colo. RPC 1.10 and denying the motion, thus disqualifying the firm from representing the plaintiff. Hence, we discharge the rule and remand the case to the trial court for proceedings consistent with this opinion.

## I. Facts and Procedural History

¶ 5 This case involves a child who allegedly became ill from E. coli after eating salad at the defendant restaurant. After the case was filed, defense counsel contacted lawyer Drew Falkenstein at a small law firm in Seattle, Washington that specializes in food-borne illness cases. Defense counsel and Falkenstein had been opposing counsel in a previous Colorado case and had maintained a cordial relationship. Before discussing the case with defense counsel, Falkenstein first determined that his law firm was not already

involved in this litigation. Over the next few days, defense counsel and Falkenstein had one telephone conversation and exchanged several e-mails. Defense counsel did not tell Falkenstein that she wanted the information they were exchanging about the case kept confidential.

¶ 6 In their telephone conversation and e-mail exchange, defense counsel and Falkenstein discussed three aspects of the case. First, they talked about defense counsel's planned theory of the case, which at that time was that the child's illness had resulted from visiting a petting zoo rather than from eating salad at the restaurant. Falkenstein advised defense counsel against that theory. Second, defense counsel asked Falkenstein for advice on a trial expert, and Falkenstein recommended an expert. Falkenstein stated that the recommended expert would "work [the] file hard and well" and "may . . . help to dig up documents." Third, Falkenstein recommended adding a lettuce distributor as a nonparty defendant after researching E. coli outbreaks for defense counsel using his law firm's publicly accessible database and finding an E. coli outbreak at another local restaurant chain. Although defense counsel did not take Falkenstein's advice to add that particular distributor as a nonparty, she did consider other lettuce distributors and lettuce growers as nonparty defendants instead. She abandoned her initial petting zoo strategy as Falkenstein had advised and hired the expert whom Falkenstein had recommended.

¶ 7 Several months after the consultation between defense counsel and Falkenstein, plaintiff's counsel contacted another attorney at Falkenstein's law firm to discuss the case. The record is unclear whether that attorney checked to see if Falkenstein or anyone else at the firm had been involved in the case. Soon after, it was agreed that the out-of-state law firm would join plaintiff's counsel in the case, and this firm filed a motion for admission pro hac vice. The defendant objected to the firm's admission because of defense counsel's earlier consultation and e-mail exchange with Falkenstein, an associate in this firm. In support of the defendant's objection to the motion, defense counsel submitted an affidavit stating that she had disclosed "confidential facts about the case" to Falkenstein. Nothing in the record indicates that defense counsel had consulted Falkenstein for the purpose of disqualifying him or his firm from later representing the plaintiff.

¶ 8 In its ruling the trial court reasoned that when defense counsel sought advice from Falkenstein about the case, she had divulged confidential information that she would not have shared with opposing counsel, including discussing her theory of the case, asking for a recommendation about an expert witness, and requesting research assistance to identify potential nonparty defendants. The trial court concluded that because Falkenstein had "recommended a particular course or theory for [the] [d]efense counsel, researched and provided [d]efense [c]ounsel with the information that now forms the basis for their trial strategy and also provide[d] them with an expert for whose credibility they vouch for in writing," Falkenstein was placed in a "position of divided loyalties" that would compromise the fairness of the proceedings if he were allowed to represent the plaintiff. As such, the trial court concluded that Falkenstein's consultation with defense counsel created a nonwaivable conflict of interest that would prohibit him from representing the plaintiff under Colo. RPC 1.7. Imputing the conflict to the out-of-state firm under Colo. RPC 1.10, the trial court denied the firm's motion for pro hac vice admission and disqualified the firm from representing the plaintiff. Plaintiff then petitioned this court under C.A.R. 21 to review the trial court's order. We granted the petition and now discharge the rule.

## II. Preliminary Matters

### Original Jurisdiction

¶ 9 Before we begin our review of the trial court's order, we first address whether an original proceeding is the proper method to review the trial court order challenged by the plaintiff. This court's choice to exercise its original jurisdiction is "entirely within its discretion." *Vinton v. Virzi*, 2012 CO 10, ¶ 9, 269 P.3d 1242. "This court may exercise original jurisdiction under C.A.R. 21 where a trial court proceeds without or in excess of its jurisdiction or to review a seri-

ous abuse of trial court discretion, and where an appeal would not be an adequate remedy." *People v. Ray*, 252 P.3d 1042, 1047 (Colo. 2011). We have previously exercised original jurisdiction over matters of attorney disqualification in both civil and criminal cases. *See, e.g., Fognani v. Young*, 115 P.3d 1268, 1271 (Colo.2005) (exercising original jurisdiction in civil disqualification case and citing criminal disqualification cases); *People v. C.V.*, 64 P.3d 272, 274 (Colo.2003).

¶ 10 Here, if the trial court's ruling disqualifying the out-of-state law firm from representing the plaintiff were overturned on appeal after disposition of the case, the parties would have to incur the significant and additional expense of a retrial with the full participation of the disqualified firm. We therefore conclude that ordinary appellate remedies are inadequate, and it is appropriate to exercise our original jurisdiction and proceed with our analysis.

### Review of Claimed Ethical Violation

¶ 11 Next, we address whether it is proper for this court to consider the alleged conflict involving Falkenstein and his law firm under the Colorado Rules of Professional Conduct when the law firm's potential client, the plaintiff, has not raised the issue. Generally, courts do not consider claimed violations of ethics rules raised by nonclients. *Mercantile Adjustment Bureau, L.L.C. v. Flood*, 2012 CO 38, ¶ 15, 278 P.3d 348. However, "where the Rules of Professional Conduct become intertwined with litigation and a potential ethical violation threatens to prejudice the fairness of the proceedings," a court may consider an ethical violation within the context of the litigation. *Id.* at ¶¶ 16–17 (holding that defendant had grounds to raise the potential ethical violations of the plaintiff's attorney where defendant would have had to pay attorney fees incurred as part of the agreement alleged to be unethical); *see also In re Appeal of Infotechnology, Inc.*,

582 A.2d 215, 219 (Del.1990) (a court may consider a violation of the ethics rules when the moving party "proves a personal detriment or misconduct which taints the fairness of the proceeding"). Whether there is a conflict under Colo. RPC 1.7 that would prohibit the firm from representing the plaintiff and would impact the fairness of the proceedings in this case is a matter intertwined with the litigation and is therefore proper for us to examine.

### Standard of Review

¶ 12 The plaintiff asks us to review the trial court's order denying pro hac vice admission of the out-of-state law firm and disqualifying the law firm from representing the plaintiff.[1] A trial court's broad discretion to disqualify counsel derives from the court's "inherent power to ensure the integrity of the process and fairness to the parties." *In re Estate of Myers*, 130 P.3d 1023, 1025 (Colo.2006).

¶ 13 By itself, a violation of the Colorado Rules of Professional Conduct may or may not be sufficient grounds for disqualification. *Taylor v. Grogan*, 900 P.2d 60, 63 (Colo.1995). "The critical question is whether the litigation can be conducted in fairness to all parties." *Id.* The Colorado Rules of Professional Conduct concerning conflicts of interest ensure fairness to the parties and protect the integrity of the process. In addition, they serve as guidelines to a court deciding disqualification. *Estate of Myers*, 130 P.3d at 1025–26. Ultimately, it is within the exclusive province of the trial court to determine whether a violation of the rules regarding conflict harms the fairness of the proceedings and warrants disqualification. *Id.*; *Taylor*, 900 P.2d at 63. This "inherent power to disqualify counsel may be exercised only when necessary to avoid unfairness to a party or protect the integrity of the proceedings, and not to discipline or punish." *Estate of Myers*, 130 P.3d at 1026.[2] Courts

---

1. The trial court's denial of the motion for pro hac vice admission resulted in the law firm's nonparticipation in the case and is effectively the same as a disqualification. We use this characterization of the trial court's ruling interchangeably.

2. *See also Hempstead Video, Inc. v. Incorporated Village of Valley Stream*, 409 F.3d 127, 132 (2d Cir.2005) (the ethical rules provide guidelines, but courts look to the fairness of the underlying trial when deciding disqualification); *Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 35, 303

balance this need to protect the integrity of the trial with the countervailing importance of the party's continued representation by counsel of choice. *Id.* at 1025.

¶ 14 When a trial court disqualifies counsel, we review the basis for disqualification under an abuse of discretion standard.[3] *People v. Harlan,* 54 P.3d 871, 877 (Colo.2002). A trial court abuses its discretion if its decision is "manifestly unreasonable, arbitrary, or unfair." *Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't,* 196 P.3d 892, 899 (Colo.2008). "It is not necessary that we agree with the trial court's decision." *Streu v. City of Colo. Springs ex rel. Colo. Springs Utils.,* 239 P.3d 1264, 1268 (Colo.2010); *accord In re Bueno,* 248 B.R. 581, 582–83 (Bankr.D.Colo.2000) (explaining that under an abuse-of-discretion standard the trial court's reason "need not be one that is agreeable to the reviewing court"). "The trial court's decision simply must not 'exceed[ ] the bounds of the rationally available choices.' " *Streu,* 239 P.3d at 1268 (quoting *Big Sky Network Can., Ltd. v. Sichuan Provincial Gov't,* 533 F.3d 1183, 1186 (10th Cir. 2008) (omission in original)). With this standard in mind, we now turn to the issues presented in this case.

### III. Analysis

¶ 15 In support of this appeal, the plaintiff makes three arguments. First, the plaintiff contends that because the Colorado Rules of Professional Conduct apply only to attorney-client relationships, and because no attorney-client relationship was formed between Falkenstein and defense counsel or between Falkenstein and the defendant, the trial court improperly applied Colo. RPC 1.7 in this case. Second, the plaintiff argues that even if Colo. RPC 1.7 does apply, the consultation between defense counsel and Falkenstein created no conflict because the consultation did not include confidential information and would not materially limit Falkenstein' s future ability to represent the plaintiff. Third, the plaintiff argues that even if there is a conflict, the conflict is waivable, and that irrespective of waivability, no conflict should be imputed to Falkenstein' s law firm.

¶ 16 In considering the plaintiff's arguments, we first discuss whether Colo. RPC 1.7 applies to an attorney-client relationship and conclude that it does. We then determine whether the trial court abused its discretion in finding that the consultation here created a conflict under Colo. RPC 1.7 on grounds that defense counsel divulged confidential information to Falkenstein, such as her theory of the case and her trial strategy, and conclude that it did not. We last examine whether the trial court abused its discretion in determining that the conflict was not waivable and then imputing the conflict to the out-of-state law firm and disqualifying the firm. Again, we conclude that it did not.

### Application of Colo. RPC 1.7

¶ 17 The plaintiff first argues that Colo. RPC 1.7 does not apply in the absence of an attorney-client relationship. However, Colo. RPC 1.7(a) states in pertinent part that a lawyer shall not represent a client if there is a significant risk that the lawyer's representation could be materially limited by the lawyer's responsibilities to another client, former client, or third person:

---

Mont. 274, 287–88, 16 P.3d 1002, 1012 (a court's decision to disqualify is properly based on the court's determination that there would be prejudice to the parties and not solely on a rule violation).

3. The result of a trial court's denial of a motion seeking pro hac vice admission is effectively the same as a disqualification, and our caselaw sets forth the standard of review for a disqualification as abuse of discretion. *Harlan,* 54 P.3d at 877. While Colorado has not addressed the standard of review for a denial of a motion for admission, other jurisdictions review a trial court's denial of a motion for *pro hac vice* admission under an abuse of discretion standard. *See People of State of N.Y. v. Epton,* 248 F.Supp. 276, 277 (S.D.N.Y. 1965) ("In New York the admission of out-of-state attorneys to practice in a given case is left to the discretion of any court of record."); *Miyashiro v. Roehrig, Roehrig, Wilson & Hara,* 122 Hawai'i 461, 228 P.3d 341, 354 (Haw.Ct.App. 2010) ("This court ... reviews the denial or limitation of pro hac vice status for an abuse of discretion."); *PCG Trading, LLC v. Seyfarth Shaw, LLP,* 460 Mass. 265, 951 N.E.2d 315, 318 (2011) (" [T]he degree of discretion accorded a judge in deciding whether to admit an out-of-State attorney is broad.").

Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

. . . .

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client *or a third person* or by a personal interest of the lawyer.

Colo. RPC 1.7(a) (emphasis added). Thus, Colo. RPC 1.7 expressly applies not only to attorney-client relationships but also to attorneys' relationships with third persons. The comments to the rule reflect this point: "Concurrent conflicts of interest can arise from the lawyer's responsibilities to another client, a former client *or a third person.*" Colo. RPC 1.7, cmt. 1 (emphasis added); *id.* cmt. 9 ("[A] lawyer's duties of loyalty and independence may be materially limited by . . . the lawyer's responsibilities *to other persons.*")(emphasis added).

¶ 18 Although the Colorado Rules of Professional Conduct do not define the term "third person," there is no limitation on Colo. RPC 1.7's application to situations in which one lawyer consults another lawyer about a client matter. The American Bar Association (ABA) has considered this very situation. [4] ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 98–411 (1998). ABA Opinion 98–411 cautions that consultations between lawyers may trigger a conflict of interest that could restrict the consulted lawyer's ability to represent a current or future client under Rule 1.7. *See* ABA Op. 98–411 at 7. For instance, if a lawyer seeks help from another lawyer in preparing her case and divulges confidential information about

her client to that lawyer during the consultation, then the other lawyer could incur a responsibility to protect that information's confidentiality, which could limit that lawyer's ability to represent a current or future client.[5] *Id.* at 9.

¶ 19 ABA Opinion 98–411 is persuasive and applicable where, as here, one lawyer has consulted another lawyer and has revealed confidential information about her case, including her theory of the case and trial strategy, that could materially limit the consulted attorney's ability to represent the opposing party in this case due to the consulted attorney's potential responsibility to keep the information confidential. Because Colo. RPC 1.7 applies expressly to third persons and because those third persons can be lawyers, we disagree with the plaintiff's argument and conclude that the trial court did not err in applying Colo. RPC 1.7 to this case.

### Falkenstein's Responsibilities to Defense Counsel

¶ 20 The plaintiff next contends that, even if Colo. RPC 1.7 applies here, the consultation between defense counsel and Falkenstein created no conflict under that rule.

¶ 21 A conflict occurs under Colo. RPC 1.7(a)(2) when a lawyer's responsibilities to another person create a significant risk that the lawyer will be materially limited in his representation of a client. When a lawyer learns confidential information from another, the lawyer's knowledge of the information creates a significant risk of materially limiting the lawyer's representation of his own present or future client. *See* ABA Op. 98–411 at 7; *see also Mitchell v. Wilmore,* 981 P.2d 172, 173 (Colo.1999) (hold-

---

**4.** Although ABA Opinion 98-411 analyzes Model Rule of Professional Conduct 1.7, not Colo. RPC 1.7, the two rules are identical.

**5.** A lawyer is impliedly authorized to make disclosures about a client when appropriate in carrying out the representation. Colo. RPC 1.6 cmt. 5. Appropriate disclosures can include disclosure of confidential information when the lawyer reasonably believes the disclosure will further her representation of the client because the lawyer will gain expertise that will help her present the client's case. ABA Op. 98–411 at 3. Consulta-

tions between lawyers are important for testing ideas about complex cases or helping lawyers gather the information necessary to competently represent a client. *See* ABA Op. 98–411 at 2; Colo. RPC 1.1 cmt 2 ("Competent representation . . . can be provided through the association of a lawyer of established competence in the field in question."). However, such consultations may create "unanticipated consequences" for the consulting lawyer and the consulted lawyer, such as conflicts of interest. ABA Op. 98–411 at 2.

ing that a non-attorney expert witness had to be disqualified where both the plaintiff and the defendant had consulted the expert).[6] Confidential information includes "mental impressions and thought processes of counsel" that are in the nature of attorney work product. *Mitchell*, 981 P.2d at 176; *see also* Charles W. Wolfram, *Modern Legal Ethics* § 6.6.1 (West 1986) (lawyer's "own thoughts on strategy or legal theories" constitute opinion work product that is immunized against discovery); *Cordy v. Sherwin–Williams Co.*, 156 F.R.D. 575, 581–82 (D.N.J.1994) (a binder of photographs, the arrangement of which manifested the "mental impressions" of counsel, constituted confidential information because the arrangement of the photographs revealed counsel's thought process even though the photographs themselves were discoverable).

¶ 22 Conversely, information that is "mere[ly] technical" or that is "routinely discoverable" does not meet a party's burden to show that confidential information was exchanged. *Mitchell*, 981 P.2d at 176; *Nikkal Indus., Ltd. v. Salton, Inc.*, 689 F.Supp. 187, 191–92 (S.D.N.Y.1988) (information on market research was nothing more than technical information exchanged in an "employment style interview"); *Palmer v. Ozbek*, 144 F.R.D. 66, 67–68 (D.Md.1992) (medical records that would have been revealed through discovery did not constitute confidential information where only the records, not litigation strategy, were exchanged). The plaintiff contends that no conflict was created here, arguing that the exchange of information between defense counsel and Falkenstein was not confidential but rather wholly technical or discoverable, and the exchange would not limit representation of the plaintiff. For instance, the plaintiff argues that defense counsel's theory of the case would have been disclosed during discovery. The plaintiff further argues that any research leading to the identities of potential nonparty defendants was a technical matter that anyone could

have located through the out-of-state law firm's publicly accessible database, and, in any event, the names of the other nonparty defendants are required to be disclosed. The plaintiff also contends that the defendant's choice of an expert witness based on Falkenstein' s recommendation in no way undermines the fairness of the proceedings because the plaintiff believes her counsel can still effectively cross-examine the expert.

¶ 23 The trial court disagreed with the plaintiff's arguments, finding that defense counsel altered her theory of the case and shaped her trial strategy based on Falkenstein' s suggestions. First, the trial court found that defense counsel did not pursue her original theory that the child's illness was caused by a visit to a petting zoo, but instead sought to determine whether another outbreak made the child ill. Second, the trial court found that defense counsel chose the expert witness Falkenstein recommended. Last, the trial court found that Falkenstein conducted research for defense counsel to identify potential nonparty defendants who were other restaurants, lettuce distributors, and lettuce growers. In short, defense counsel confided in Falkenstein in a way that gave him insight into the way she approached this case, and he provided her with feedback that caused her to change her approach. Despite plaintiff's argument that Falkenstein does not remember the specifics of the consultation, Falkenstein' s affidavit to the court contradicted that assertion and shows that he recalled defense counsel's original planned theory of defense. Although the plaintiff argued that the defendant could be prevented from mentioning that Falkenstein recommended the defense expert witness, the trial court ruled that it would not be possible for Falkenstein to cross-examine the expert without the jury hearing about his recommendation.

¶ 24 The trial court reasoned that because Falkenstein had a hand in defense counsel's theory of the case and her trial strategy, his

6. In *Mitchell*, both parties consulted the same expert on traffic accidents. *Mitchell*, 981 P.2d at 173–79. Here, both plaintiff and defendant consulted the same law firm with expertise in food-borne illness cases. *Mitchell* is therefore analogous because the circumstances of the law-

yer-lawyer consultation here are similar to those of the lawyer-expert consultation in *Mitchell*. *Mitchell* recognizes that experts and attorneys play different roles in litigation and that those roles justify a heightened standard for attorneys. *Id.* at 175.

resulting responsibilities to her created a situation of divided loyalties. On the one hand, if Falkenstein were to represent the plaintiff, he would have a responsibility to act in the plaintiff's best interests by using the insight he gained from his consultation with defense counsel to the plaintiff's advantage. On the other hand, Falkenstein, because of his responsibility of confidentiality to defense counsel, would be prevented from doing so. Nor could an attorney from the out-of-state law firm successfully impeach defense counsel's chosen expert without the jury hearing that a member of the firm to which plaintiff's counsel belonged had recommended the defense expert, which would be detrimental to the plaintiff. Based on these findings, the trial court concluded that Falkenstein' s consultation with defense counsel created a conflict under Colo. RPC 1.7(a).

¶ 25 Given the evidence before the trial court and the nature of its findings as being grounded in that evidence, we hold that the trial court was not manifestly arbitrary, unreasonable, or unfair, and therefore did not abuse its discretion in finding that there was a conflict under Colo. RPC 1.7(a).

### Waiver of the Conflict and Imputation to the Firm

¶ 26 Last, we examine the plaintiff's arguments (1) that even if there is a conflict, it is waivable by the plaintiff under Colo. RPC 1.7(b); and (2) that irrespective of whether the conflict is waivable, the trial court abused its discretion when it imputed the conflict to the small law firm. The plaintiff represents that she would waive any conflict in order to allow continued representation by the out-of-state law firm. Although the plaintiff has not yet made a formal waiver, the record reveals that the plaintiff would waive any conflict and we accept this representation and turn to analyze these issues.

▉▉▉ ¶ 27 Even if a conflict exists under Colo. RPC 1.7(a), the lawyer may continue to represent the client if the lawyer "reasonably believes that the lawyer will be able to provide competent and diligent representation" to his client and if the client waives the conflict. Colo. RPC 1.7(b)(1). Although Colo. RPC 1.7(b) permits conflicts

under the rule to be waived, the trial court must still decide whether such waiver would impact the fairness of the proceedings. As such and in order to protect the integrity of the proceedings, it is within the trial court's power to disqualify counsel, even if the party is willing to waive the conflict. *See Estate of Myers*, 130 P.3d at 1026. "[C]ourts have the inherent power to ensure both the reality and appearance of integrity and fairness in proceedings before them." *Id.* at 1025. Trial courts balance the need to protect the integrity of the trial with the countervailing importance of the party's continued representation by counsel of choice when deciding whether to disqualify counsel even in the presence of a valid waiver. *Id.*; *Fognani*, 115 P.3d at 1272. The critical question that governs whether disqualification is necessary is whether the litigation can be conducted in fairness to all parties. *Estate of Myers*, 130 P.3d at 1025; *Harlan*, 54 P.3d at 876. Here, we look to the Colorado Rules of Professional Conduct to review whether the trial court abused its discretion when it ruled that the conflict under Colo. RPC 1.7(a) was nonwaivable and imputed Falkenstein' s conflict to the entire firm because otherwise the proceedings would be unfair.

▉▉▉ ¶ 28 Colo. RPC 1.10 prohibits lawyers associated in the same firm from representing a client if any one of the lawyers is prohibited from doing so by a conflict: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9." Colo. RPC 1.10(a). "[A] firm of lawyers is essentially one lawyer" for purposes of the rules governing client conflicts. Colo. RPC 1.10 cmt. 2. "The treatment of attorneys in a firm as one attorney for purposes of loyalty and confidentiality is based on the presumption that those attorneys have access to confidential information about each other's clients." *People ex rel. Peters v. Dist. Court*, 951 P.2d 926, 930 (Colo.1998).

▉▉▉ ¶ 29 The trial court concluded that the consultation between Falkenstein and defense counsel resulted in a nonwaivable conflict that would compromise the fairness of

the proceedings. Applying our abuse of discretion standard, this ruling is within the "bounds of rationally available choices" and within the trial court's inherent power to ensure the integrity and fairness of the proceedings. Hence, we do not disturb it on appeal.

¶ 30 Similarly, the trial court imputed the conflict to the rest of Falkenstein' s law firm, following the same reasoning. The trial court ruled that under Colo. RPC 1.10 and Colorado caselaw, every lawyer at the small out-of-state firm is presumed to have access to the confidential information defense counsel divulged to Falkenstein. The law firm has a single office, specializes in one practice area, and has a small membership. In addition, we note there is no indication in the record that defense counsel contacted Falkenstein as a trial tactic in an effort purposely to disqualify the out-of-state law firm.[7] See ABA Op. 98–411 at 5 n. 8. Hence, we conclude that imputation of the nonwaivable conflict to this firm under the circumstances of this case was also within the bounds of rationally available choices and did not constitute an abuse of discretion.

### IV. Conclusion

¶ 31 For the reasons stated above, we discharge the rule and remand this case to the trial court for proceedings consistent with this opinion.

JUSTICE EID dissents, and JUSTICE HOBBS joins in the dissent.

JUSTICE EID, dissenting.

¶ 32 Today, the majority mistakenly deprives the plaintiff, a child who became seriously ill allegedly after eating a salad at the defendant's restaurant, of her counsel of choice—one of the most prominent food-borne-illness law firms in the country. It comes to this conclusion by making two significant errors. First, the majority places virtually no weight on the importance of allowing parties to be represented by the counsel of their choice. Second, the majority fails to consider the requirement that significant prejudice be found before disqualification is appropriate. By failing to give appropriate weight to plaintiff's choice of counsel and to require a showing of significant prejudice, the majority erroneously disqualifies counsel in this case and, moving forward, needlessly chills the casual consultations among attorneys that are so vital to the profession. For these reasons, I respectfully dissent from the majority's opinion.

¶ 33 Just a few years ago, we "emphasized the . . . importance, in both the criminal and civil contexts, of continued representation of parties by counsel of their choice." In re Estate of Myers, 130 P.3d 1023, 1025 (Colo. 2006). Indeed, "the preservation of this freedom of choice of counsel is a central feature of our adversary system," and "is of substantial importance to the integrity of the judicial process." Rodriguez v. District Court, 719 P.2d 699, 706 (Colo.1986). Thus, "we have made clear that disqualification is a severe remedy that should be avoided whenever possible," and we have instructed lower courts that they should "impose less severe sanctions whenever they would be adequate" "to ensure the integrity of the process and fairness to the parties." Estate of Myers, 130 P.3d at 1025.

¶ 34 The majority mentions this fundamental tenet only in passing. Maj. op. ¶¶ 1, 27. In fact, it treats this case as if it involved the disqualification of an expert witness, employing the analysis set forth in Mitchell v. Wilmore, 981 P.2d 172, 173 (Colo.1999), which involved the disqualification of an expert that had consulted with both the plaintiff and defendant in a personal injury suit. See maj. op. ¶¶ 21–22. Not surprisingly, the court in that case made no mention of the importance of preserving plaintiff's choice of counsel because the case did not involve the plaintiff's choice of counsel. By contrast, in In re Estate of Myers, our most recent case involving disqualification of counsel in a civil case, we emphasized that, although a court "necessarily retain[s] the discretion to disqualify attorneys from further representa-

---

7. Consulting with a lawyer likely to represent an adverse party for the deliberate purpose of disqualifying a potential adversary would violate the Rules of Professional Conduct, which prohibit conduct involving dishonesty and fraud. ABA Op. 98–411 at 5 n. 8.

tion," it must consider "the countervailing importance" of continued representation of a party by her counsel of choice. 130 P.3d at 1025. Here, the majority gives virtually no weight to the "countervailing" factor of plaintiff's choice of counsel. It is thus not surprising, then, that it finds that the balance weighs in favor of disqualification.

¶35 Under the proper analytical framework, a plaintiff's counsel of choice cannot be set aside unless it is shown that there is "a clear danger that prejudice to a client or adversary would result from continued representation." *Id.* at 1025; *see also id.* at 1027 (noting that prejudice must be weighed in the disqualification calculus). The required showing of prejudice cannot be "based on mere speculation or conjecture," but rather is the sort that would "seriously threaten[ ]" the integrity and fairness of judicial proceedings. *Id.* at 1025, 1027. Even then, there also must be a showing that "any remedy short of disqualification would be ineffective." *Id.* at 1027. In this case, a showing of significant prejudice has not been made.

¶36 The trial court based its disqualification of plaintiff's counsel primarily on the fact that, during the conversation between defense counsel and another attorney at plaintiff counsel's firm, Drew Falkenstein, Falkenstein recommended that defendant retain a particular expert, which it went on to do. The majority expresses its concern that plaintiff's counsel could not "successfully impeach defense counsel's chosen expert without the jury hearing that a member of the firm to which plaintiff's counsel belonged had recommended the defense expert, which would be detrimental to the plaintiff." Maj. op. ¶ 24.

¶37 The problem with the majority's analysis on this point is that there is no reason to think that plaintiff counsel's representation would be seriously impeded by this fact. If the issue were to come up at trial, plaintiff's counsel would deal with it appropriately; for example, he could say that he holds defendant's expert in the highest regard—and in fact a member of his law firm recommended that defendant retain him—but he still questions the expert's conclusions with regard to the case. Moreover, it is undoubtedly true that plaintiff's firm had worked with the particular expert in the past; otherwise, Falkenstein would have had no basis for recommending him. Viewed in this light, the fact that Falkenstein recommended the expert to defense counsel would simply be cumulative information. In my view, this issue would have a minor impact, if any, on plaintiff counsel's ability to represent plaintiff, and it plainly falls short of the kind of prejudice that threatens to undermine the fairness and integrity of the proceedings requiring disqualification. *Compare Rodriguez v. District Court,* 719 P.2d 699, 707 (Colo.1986) (holding that a defendant should not be precluded from waiving conflict-free representation, especially when "the conflict of interest may prove of relatively minor significance at trial"), with *Fognani v. Young,* 115 P.3d 1268, 1270 (Colo.2005) (affirming a trial court's decision to disqualify counsel when attorney was very likely to be a necessary substantive witness at trial).

¶38 The majority also concludes that disqualification is required because plaintiff's counsel, through Falkenstein, "had a hand in defense counsel's theory of the case and her trial strategy." Maj. op. ¶ 24. In this regard, the majority vastly overstates Falkenstein' s advice and involvement. Defense counsel called Falkenstein and told him she was looking into whether she could argue that plaintiff's illness was caused by another source of *E. coli,* specifically a petting zoo. Falkenstein looked at his law firm's publicly available database, which keeps track of *E. coli* outbreaks throughout the country, and suggested that instead of the petting zoo, she look into an *E. coli* outbreak connected to another restaurant in southern Colorado. The information about potential alternate causes cannot be deemed confidential because it was publicly available information that defense counsel could have gained herself through using the database. And importantly, defense counsel added neither the petting zoo nor the other restaurant as third-party defendants in this case. In fact, there is no indication that those entities ever played a role in the case, let alone a continuing role. At most, Falkenstein learned that the defense counsel would argue that plain-

tiff's illness was caused by a source of *E. coli* not connected to her client. But again, this is not confidential information; it is something that plaintiff's counsel would have learned in any event as the trial progressed.

¶ 39 The majority postulates that plaintiff's counsel could "us[e] the insight [that Falkenstein] gained from his consultation with defense counsel to the plaintiff's advantage." Maj. op. 24. But as with prejudice toward the plaintiff in this case, there has been no showing of significant prejudice to the defendant–that is, no showing that plaintiff's counsel would in fact be able to use the information gleaned from the conversation to gain an unfair advantage over the defendant. Instead, the majority's analysis is precisely the sort of "speculation and conjecture" we condemned in *In re Estate of Myers*, where the trial court erroneously based its disqualification decision on the fact that the party should proceed with "untainted counsel." 130 P.3d at 1026.

¶ 40 The majority eventually relies upon *In re Estate of Myers* in its analysis, but not for the propositions discussed above. Instead, it notes that under the case, the court has the inherent authority to disqualify counsel. Maj. op. ¶¶ 13, 27, 29. But there, we discussed a court's inherent authority to disqualify in the context of the analysis outlined above; in other words, a trial court cannot merely rely on its inherent authority to disqualify in issuing a disqualification order. Indeed, in *In re Estate of Myers,* we reversed the trial court's order based on its failure to employ the proper analysis, stating that, standing alone, even an actual [rule] violation ... would be insufficient to support [a disqualification] order. Disqualification as a remedy for such an impropriety, even where privileged information

is actually involved, must turn on a host of other considerations, including the flagrancy of the attorney's conduct; the sensitivity of the information and its relevance to the particular proceedings; and the prejudice to be suffered by the non-moving party.

¶ 41 Because the disqualification of a party's chosen attorney is an extreme remedy, appropriate only where required to preserve the integrity and fairness of judicial proceedings, it must be supported by a showing not only that the proceedings appear to be seriously threatened, but also by a showing that any remedy short of disqualification would be ineffective. 130 P.3d at 1027 (citations omitted). Thus, even where there is a rule violation involving confidential information (which, in this case, there is not [6]), the "extreme" remedy of disqualification is appropriate only after there has been a showing of significant prejudice. This standard has not been met in this case—either by the trial court or by the majority.[7]

¶ 42 As a result of its errors, the majority needlessly deprives this particular plaintiff of her counsel of choice. But this case has far broader significance for the legal profession. Here, defense counsel turned to a colleague in the field of food-borne-illness law for a recommendation of an expert and to vet a possible alternate source of *E. coli.* We should be encouraging, not discouraging, this sort of casual consultation based on non-confidential information. As the American Bar Association has noted, "[s]eeking advice from knowledgeable colleagues is an important, informal component of a lawyer's ongoing professional development[, and] [t]esting ideas about complex or vexing cases can be beneficial to a lawyer's client." ABA Formal Op. 98–411 (Aug. 30, 1998). After today's

---

6. Even assuming that a casual conversation that contained no confidential information somehow created a duty of confidentiality, this duty would not lead to a violation of Colo. RPC 1.7, as the majority claims. Rule 1.7(a) prohibits a lawyer from representing a client if the representation would create a concurrent conflict of interest. A concurrent conflict of interest arises if "there is a *significant risk* that the representation of one or more clients will be *materially limited* by the lawyer's responsibilities to another client, a former client or a third person." Colo. RPC

1.7(a)(2) (emphasis added). As with the prejudice analysis, there has been no showing in this case of "significant risk" or "material limit[ation]."

7. Because I would reverse the trial court's conclusion that the conversation between defense counsel and Falkenstein required disqualification, I find it unnecessary to consider the issue of whether the entire firm should be disqualified. Maj. op. ¶¶ 28–30.

opinion, these sorts of conversations, so vital to the profession, simply will not happen.

¶ 43 The majority notes that there is no evidence that the consultation in this case was committed for purposes of disqualifying plaintiff's counsel. Maj. op. ¶ 30.[8] But the majority's observation misses the point. Motions to disqualify an opponent's attorney should be viewed with "skepticism" because of their "*potential* use as dilatory or tactical devices." *In re Estate of Myers,* 130 P.3d at 1025 (emphasis added); *see also Vinton v. Virzi,* 2012 CO 10, ¶ 11, 269 P.3d 1242, 1246. Rather than proceeding with the appropriate caution as outlined in our previous caselaw, the majority affirms the trial court's disqualification order on the ground that it was "within the bounds of rationally available choices." Maj. op. ¶ 30.

¶ 44 For the reasons outlined above, I respectfully dissent from the majority's opinion.

I am authorized to state that JUSTICE HOBBS joins in this dissent.

**8.** Plaintiff implies a strategic motive in this case, noting that defense counsel responded to the petition with an email stating, "if you let [defendant] out [of the case]—this matter is moot."